UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 1:18-cr-033–25-JL |
| | ) | |
| PAUL AARON | ) | |
| | ) | |

## UNITED STATES' OBJECTION TO DEFENDANT'S MOTION TO SUPPRESS

While conducting a wiretap investigation of a drug trafficking organization, officers identified a phone number used by a person ordering kilograms of fentanyl from distributor, Sergio Martinez. Intercepted calls over that number and surveillance led to the defendant's arrest on March 7, 2018. The defendant was identified during booking, confirming that he, Paul Aaron, was the person using the phone to order fentanyl from Sergio Martinez. On October 9, 2018, the Court held a hearing on the defendant's motion to suppress evidence seized pursuant to a search of his residence and person on March 7, 2018. Because of evidence presented by the defendant at that hearing, the government assented to the defendant's motion to suppress. The Court granted the motion.[1]

The defendant now claims that his arrest on March 7, 2018, was unlawful and therefore that his "identifying information . . . and the fruits thereof" should be suppressed as well. The defendant's arrest, however, was supported by probable cause and his identity, therefore, should not be suppressed. Alternatively, even if the Court concludes that the arrest was unlawful, the defendant's identity should not be suppressed because officers did not exploit the illegal arrest

---

[1] During that hearing, items B and C in the defendant's "Motion to Suppress II," were suppressed by agreement of both parties. The defendant does not specify why item D should be suppressed other than that it is arguably a "fruit of" the defendant's allegedly unlawful arrest. Therefore, the government has not separately addressed it, presuming that the defendant agrees that if his identity is not suppressed, the telephone seized pursuant to the April 9, 2018, search warrant should not be suppressed either.

*for the purpose* of identifying him. *See United States v. Oscar-Torres*, 507 F.3d 224, 230 (4th Cir. 2007). Finally, even if the Court were to suppress the identifying information initially learned during the arrest, the defendant subsequently identified himself during intercepted calls to a coconspirator. Those statements cannot be suppressed because they are sufficiently attenuated from any prior taint and officers would have inevitably discovered his identity. *Murray v. United States*, 487 U.S. 533, 536-37 (1988).

**I. The Defendant's March 7, 2018 Arrest Was Supported by Probable Cause.**

On March 7, 2018, DEA agents were monitoring the wiretap of Sergio Martinez's telephones. They and other investigators involved in the arrest were aware of the following information:

*a. The Sergio Martinez DTO used taxis to deliver drugs to their largest customers.*

On February 2, 2018, investigators intercepted Sergio Martinez telling a drug customer, later identified as Steven Lessard, that he would send him "one." Investigators observed a taxi pick up a distributor outside the drug trafficking organization's ("DTO") stash house and then conducted a traffic stop of the taxi. Julio Colon was identified as the taxi driver. The distributor was in the back seat with a kilogram of fentanyl, confirming that Lessard's order of "one" meant one kilogram. Immediately after the stop, Sergio Martinez called the taxi driver and discussed the circumstances of the arrest. The calls make clear that the taxi driver was aware that the distributor had drugs in the back of the taxi.

On February 23, 2018, Sergio Martinez sent another kilogram of fentanyl to Lessard. Sergio Martinez called the same taxi driver, and asked if he could make a delivery that evening. The taxi driver said that he would send his friend instead. Investigators conducted surveillance of Lessard's residence and observed a taxi arrive outside around the time the delivery was to occur.

2

An unidentified male exited the taxi, entered Lessard's residence, and left in the taxi a few minutes later.

> b. *A person using the telephone number (978) 327-9051 ordered one kilogram of fentanyl to be delivered to 100 Stackpole Street in Lowell on March 2, 2018.*

On March 1, 2018, investigators intercepted telephone calls with the defendant's phone, (978) 327-9051 ("the 9051 Phone").[2] The defendant told Sergio Martinez, "you know how I got two, right?" He continued, "I did one already." He told Sergio Martinez to "come through and drop one off" and said he would give him the "dough" from the one he sold. The defendant continued, "I hate holding dough, that's why." *See* Government's Exhibit 1. Investigators would testify that they knew that Sergio Martinez only made deliveries to large-scale customers, and based on the investigation, believed "one" and "two" referred to kilograms of fentanyl.

On March 2, 2018, Sergio Martinez called the defendant and told him, "I'm sending this kid over there, ok?" The defendant responded, "bring one" and told Sergio Martinez that he would text him the address. *See* Government's Exhibit 2. The defendant then texted, "100 Stackpole St." Shortly thereafter, he sent, "hmu [hit me up] when near rotary." *See* Government's Exhibit 3. One hundred Stackpole Street is near a rotary, both of which are in the neighborhood of the defendant's arrest in Lowell, Massachusetts. At approximately 9:18 p.m., Sergio Martinez called and said that a "black CRV" was coming. The defendant responded, "I'm coming right now" and continued, "I got 23 in here, alright?" *See* Government's Exhibit 4. Investigators would testify that they knew that Sergio Martinez typically charged around $23,000 for one kilogram of fentanyl, confirming their earlier belief that when the defendant referred to "one" he meant one kilogram. On a final intercepted call that day, the defendant confirmed that

---
[2] At that time, investigators had not identified the defendant as the person using the telephone. All references to calls from the defendant were made using the 9051 Phone unless otherwise noted.

he met Sergio Martinez's distributor. *See* Government's Exhibit 5. Investigators were unable to conduct surveillance of this transaction.

    c. *On March 7, 2018, the person using the 9051 Phone ordered one kilogram of fentanyl to be delivered to 10 Fayette St. in Lowell.*

Various intercepted calls informed the actions of law enforcement leading up to the defendant's arrest on March 7, 2018. The following calls and text messages were intercepted that day over Sergio Martinez's telephone:

| TIME | FROM | TO | SUMMARY | EX |
|---|---|---|---|---|
| 7:12 p.m. | 9051 Phone | Sergio Martinez | Defendant ordered "one." Sergio Martinez asked, "you want me to send someone?" Defendant replied, "yeah." Sergio Martinez responded, "let me see if he wants to go." Sergio Martinez then asked an unidentified person, in Spanish, "do you want to see the black guy?" | 6 |
| 8:24 p.m. | Sergio Martinez | Taxi Driver | Sergio Martinez called taxi driver and asked if his "friend" would bring someone to Lowell. | 7 |
| 8:47 p.m. | Sergio Martinez | 9051 Phone | Sergio Martinez called defendant and said, "I'm on my way, okay?" | 8 |
| 8:51 p.m. | 9051 Phone | Sergio Martinez | TEXT: "10 Fayette" | 9 |
| 8:52 p.m. | 9051 Phone | Sergio Martinez | TEXT: "10 Fayette st." | 10 |
| 8:53 p.m. | Sergio Martinez | Taxi Driver | Sergio Martinez called taxi driver and asked, "is he there?" He continued, "I am coming out in a second." | 11 |
| 9:21 p.m. | Runner | Sergio Martinez | Runner told Sergio Martinez, "tell him 5 minutes." | 12 |
| 9:22 p.m. | Sergio Martinez | 9051 Phone | TEXT: "5 minute" | 13 |
| 9:22 p.m. | Sergio Martinez | 9051 Phone | TEXT: "he there" | 14 |
| 9:22 p.m. | 9051 Phone | Sergio Martinez | TEXT: "K" | 15 |
| 9:27 p.m. | Runner | Sergio Martinez | Runner told Sergio Martinez to "call him" and that he is there. | 16 |

4

| 9:27 p.m. | Sergio Martinez | 9051 Phone | TEXT: "There." | 17 |
| 9:28 p.m. | Runner | Sergio Martinez | Runner called Sergio Martinez and asked, "is he driving or what?" Sergio Martinez responded "let me call him." | 18 |
| 9:29 p.m. | 9051 Phone | Sergio Martinez | Sergio Martinez asked, "Got it?" Defendant responded, "yeah." | 19 |

In sum, the intercepted calls showed that Sergio Martinez was sending a distributor, in a taxi, to meet a man at 10 Fayette Street in Lowell, to deliver one kilogram of fentanyl. The delivery occurred between approximately 9:28 and 9:29 p.m.

    d. *Observations of Law Enforcement Officers on March 7, 2018.*

At the same time that these calls occurred, a taxi left the area in front of 10 Fayette Street. Seconds later, the defendant left the same area on foot carrying a bag that could fit a kilogram of drugs. There was a heavy snow storm that evening and very few other people, if any, were on the street.

    e. *These facts clearly support probable cause to arrest the defendant.*

Together, these facts create probable cause that the defendant was the person using the 9051 Phone and that he received a kilogram of fentanyl that night. Based on the intercepted calls, the officers expected a taxi to have delivered a kilogram of fentanyl to a male at 10 Fayette Street in Lowell between 9:28 and 9:29 p.m. The defendant and the taxi were exactly where they were expected to be at that time. There were few, if any, other people on the street. Probable cause exists when "the facts and circumstances within [the police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." *United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir. 1987) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

In evaluating probable cause, the Court considers the totality of the circumstances. *Id.* at 1024. "[T]he government need not show the quantum of proof necessary to convict." *Id.* at 1023. Indeed, probable cause requires less proof than a "preponderance of the evidence" or "more likely than not." *United States v. Alicea*, 2017 WL 3122560 at *3 (D. Mass. July 21, 2017); *United States v. Melvin*, 586 F.2d 492, 495 (1st Cir. 1979). Instead, "probability is the touchstone." *Figueroa*, 818 F.2d at 1024 (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).

The wiretap information received by those agents monitoring the phones can be considered in the probable cause determination, whether or not agents on the street knew it, because a probable cause determination is based on the "collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation." *United States v. Fiasconaro*, 315 F.3d 28, 36 (1st Cir. 2002) (quotations omitted). *See also United States v. Taylor*, 162 F.3d 12, 18 n.2 (1st Cir. 1998) (citations omitted) (holding that information regarding informant's reliability could be imputed from one desk officer to field officers).[3] Because the defendant's arrest was supported by probable cause, his identification during the booking process should not be suppressed, and the Court's inquiry should end there.

**II. Even if the Court Finds that the Arrest Was Unlawful, the Defendant's Identity Should Not be Suppressed.**

Even if the arrest was unlawful, the identity of the defendant should not be suppressed. In *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984), the Supreme Court wrote that "the 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." Circuit Courts interpreting *Lopez-Mendoza* are split on whether this

---

[3] In any event, the pertinent information from the wire on March 7, 2018, was being called out in real time to the officers positioned in the area of 10 Fayette St.

6

merely reaffirms the proposition that illegal police activity does not preclude a court from exercising personal jurisdiction over a defendant *or* whether it means that evidence of identity can never be suppressed. The First Circuit has not yet weighed in on this issue. *United States v. De Los Angeles*, 863 F. Supp. 2d 106 (D. Mass 2012) (reviewing circuit precedent and noting First Circuit has not addressed the issue).

This split, however, is immaterial because under either interpretation of the Supreme Court's decision, the facts here do not warrant suppression of the defendant's identity. The defendant relies on *United States v. Oscar-Torres*, 507 F.3d 224, 230 (4th Cir. 2007), which held that the Supreme Court's decision in *Lopez-Mendoza* did not preclude suppression of unlawfully obtained evidence relating to identity under some circumstances. The Fourth Circuit held that evidence of identity (in that case, fingerprints and a criminal record) "is suppressible only if obtained by '*exploitation*' of the initial police illegality." *Id.* (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). "When police officers use an illegal arrest as an investigatory device in a criminal case 'for the purpose of obtaining fingerprints without a warrant or probable cause,' then the fingerprints are inadmissible under the exclusionary rule." *Id.* at 230-31. The Court continued, however, that when "fingerprints are administratively taken . . . for the purpose of simply ascertaining . . . the identity or immigration status of the person arrested, they are sufficiently unrelated to the unlawful arrest that they are not suppressible." *Id.* at 231 (quotations omitted). Likewise, the Supreme Court has suppressed fingerprint evidence when officers arrested and detained criminal suspects without probable cause for the sole purpose of connecting them to specific crimes. *Hayes v. Florida* 470 U.S. 11 (1985); *Davis v. Mississippi*, 394 U.S. 721 (1969). That is not the case here.

In this case, officers arrested the defendant, not for the purpose of identifying him, but because they believed that he received a kilogram of fentanyl in a just completed drug deal. In fact, DEA agents will testify that were it not for their concern about the public safety risk of allowing the defendant to receive a kilogram of fentanyl to further distribute, they would not have sent officers out in a snow storm that night. If their primary goal was to identify the defendant, they did not need to do it in the middle of a blizzard. Therefore, even if the First Circuit adopted the minority view articulated in *Oscar-Torres*, this identity evidence may be suppressed only if the officers illegally arrested the suspect *for the purpose of identifying him*. That was not the purpose here. The District of Massachusetts held in a comparable case, "[e]ven if this Court were to take the minority position that fingerprint evidence is suppressible when an arrest is exploited for the primary purpose of obtaining a suspect's fingerprints . . . [this defendant] was stopped because [officers] had reason to believe, correctly as it turned out, that he possessed a large quantity of drugs." *De Los Angeles,* 863 F. Supp. 2d at 108. Likewise, the officers here had reason to believe (indeed, they had probable cause), that the defendant possessed a large quantity of drugs. They arrested him for that reason and therefore, his identity should not be suppressed.

**III. The Defendant's Admissions and Self-Identification Over Subsequent Intercepted Calls are so Attenuated as to Dissipate Any Initial Taint.**

The defendant "cannot claim immunity from prosecution simply because his appearance in court was precipitated by an unlawful arrest." *United States v. Crews*, 445 U.S. 463, 474 (1980). Even if the Court were to find that the arrest was unlawful and that the defendant was taken into custody for the sole purpose of identifying him, the defendant, after his release from custody, made statements to Sergio Martinez over intercepted telephone calls during which he

8

described the arrest, and provided his name, address and telephone number, clearly allowing law enforcement officers to identify him.

On March 10, 2018, at 3:05 p.m., the defendant used a different telephone number, (978) 398-4561, to call Sergio Martinez and tell him about the arrest.[4] He told Sergio Martinez that he was arrested "Wednesday night . . . the snow storm." He said that officers arrested him with "two bricks." He described how "homeboy came with one" and the other was found pursuant to a search warrant. He also told Sergio Martinez that he gave the police his name during the arrest. Sergio Martinez pulled up a news article about the arrest, and asked the defendant if his name was "Aaron" and the defendant replied, "yeah." *See* Government's Exhibit 20.

At 3:22 p.m., Sergio Martinez called the defendant back and read parts of the newspaper article about his arrest to him. Sergio Martinez asked if the defendant lived at "Merrimack Street, Apartment 5." The defendant responded, "yeah." Sergio Martinez and the defendant then discussed what would happen to the defendant's drug customers and Sergio Martinez offered to serve them until the defendant got back on his feet. They decided to get the defendant's phone number (seized by police) transferred to a new phone and the defendant asked Sergio Martinez what number he had used when they spoke on Wednesday. Sergio Martinez then looked through his phone and asked, "327-9051?" The defendant responded, "that sounds like it, yeah." The defendant wrote the number down. *See* Government's Exhibit 21. Within days, the defendant had the 9051 number transferred to a new phone, and began using it to call Sergio Martinez. Over various weeks, until his April arrest, the defendant used the 9051 Phone to work with Sergio Martinez to sell fentanyl to his customers again.

---

[4] A voice comparison would also confirm that the defendant was the person on the phone.

The exclusionary rule only prohibits the introduction of derivative evidence "up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint." *Murray v. United States*, 487 U.S. 533, 537 (1988). The defendant's decision to describe his arrest in detail to a coconspirator over a lawfully intercepted telephone call is sufficient attenuation. "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question is whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary every taint." *Wong Sun*, 371 U.S. at 487-488. In *Wong Sun*, a defendant's voluntary statement to the police several days after release on his own recognizance was "so attenuated as to dissipate the taint" of an initial illegality. The defendant's decision to describe his arrest and confess to a third party is attenuated and completely independent of any law enforcement action, let alone an exploitation of the initial arrest.

### IV. Agents Would Have Inevitably Discovered the Defendant's Identity.

Finally, even if the defendant was not arrested that evening, officers would have identified him by other means. Under the inevitable discovery exception to the exclusionary rule, the court may admit illegally obtained evidence if the evidence would inevitably have been discovered through independent, lawful means. *See Murray*, 487 U.S. at 539. Investigators will testify that during the wiretap investigation, they dedicated substantial time and resources to identifying various individuals intercepted over the wiretap. They did so by seeking GPS search warrants for telephone numbers, conducting surveillance of the locations of those phones, and placing telephone calls to the intercepted numbers to observe who answered them. Investigators

10

would testify that had they not identified the defendant earlier in this investigation, they would have pursued alternative means to identify him based on their knowledge of the street addresses he provided over the intercepted calls and the phone number he used.

### V.     Conclusion

For the reasons stated, this Court should deny the defendant's motion to suppress.

January 18, 2019                                         Respectfully submitted,

                                                        Scott W. Murray
                                                        United States Attorney

                                                        /s/ Georgiana L. Konesky
                                                        Assistant U.S. Attorney
                                                        Massachusetts Bar # 685375
                                                        53 Pleasant Street, 4th Floor
                                                        Concord, NH 03301
                                                        603-225-1552
                                                        georgiana.konesky@usdoj.gov

                                                        /s/ Seth R. Aframe
                                                        Assistant U.S. Attorney
                                                        Massachusetts Bar # 685375
                                                        53 Pleasant Street, 4th Floor
                                                        Concord, NH 03301
                                                        603-225-1552
                                                        seth.aframe@usdoj.gov

## **CERTIFICATION**

I certify that a copy of this motion has been served electronically, through ECF, on counsel of record, on January 18, 2019.

/s/ Georgiana L. Konesky
Assistant U.S. Attorney